**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID BENJAMIN, M.D.,** | : | **Case No. 2:02-CV-668** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | |
| **DAVID E. SCHULLER, M.D.,** *et al.* | : | **Magistrate Judge Abel** |
| | : | |
| **Defendants.** | : | |

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter is before the Court on the Motion for Summary Judgment of Defendants,

members of The James Board of Trustees,[1] and members of The Ohio State University Hospitals

Board of Trustees.[2]  In this civil rights action, David Benjamin, M.D. ("Plaintiff") alleges that

his clinical privileges were revoked at The Arthur G. James Cancer Hospital and Richard J.

Solove Research Institute at The Ohio State University (collectively, "The James") and at The

Ohio State University Medical Center (the "Medical Center") in violation of his federal due

---

[1]The James Board of Trustees consists of Defendants Clara D. Bloomfield, M.D.;
William B. Farrar, M.D.; R. Reed Fraley; Reinhard A. Gahbauer, M.D.; Ellen Hardymon; Curtis
J. Moody; Greta J. Russell; David E. Schuller, M.D.; Daniel M. Slane; Robert B. Smith; Zuheir
Sofia; Richard J. Solove; and Manuel Tzagournis, M.D.

[2]The Ohio State University Hospitals Board consists of Defendants Meron Brachman; R.
Reed Fraley; Peter Frenzer; John F. Havens; Karen Holbrook; John G. Kramer, M.D.; Hagop S.
Mekhjian, M.D.; Richard R. Murphey, Jr.; Timothy O'Dell; Michael Para, M.D.; Nancy Petro;
Robert E.H. Rabold; Fred Sanfilippo, M.D; Grayce M. Sills, M.D.; Daniel M. Slane; Zuheir
Sofia; Sarah Ross Soter; and Ann I. Wolfe.  Defendant Havens is not a named Defendant on the
docket for this case.

process and equal protection rights.  For the reasons set forth herein, Defendants' Motion is **GRANTED**.

## II. BACKGROUND[3]

### A. Facts

As this matter is before the Court on Defendants' Motion, the Court relies on the facts set forth in the non-movant's complaint (the "Complaint").

Plaintiff is an Iraqi-born Israeli and a naturalized citizen of the United States.  On July 1, 1990, Plaintiff was appointed to the staff of The James, a state-assisted comprehensive cancer facility.  In conjunction with his appointment to The James staff, Plaintiff was granted medical staff privileges at both The James and the Medical Center, one of the Ohio State University ("OSU") Hospitals.  Also in conjunction with The James appointment, Plaintiff was appointed to the faculty of The Ohio State University College of Medicine and Public Health (the "College of Medicine").  Plaintiff was tenured at the College of Medicine in July 1992.  Because of these appointments, Plaintiff's employment fell under the auspices of The James, the Medical Center (through the Department of Internal Medicine's Division of Hematology and Oncology), and the College of Medicine.  In addition, Plaintiff was employed by DMF of Ohio, Inc. ("DMF"), the corporation that handles the private practice of medicine for physicians employed by the Medical Center's Department of Internal Medicine.

At all relevant times prior to July 1, 1999, Ernest Mazzaferri, M.D. was Chairman of Internal Medicine at the Medical Center, as well as Chairman of the Board of Trustees and

---

[3]This section is based on the facts from the Court's September 29, 2003 Order in which it granted in part and denied in part Defendants' Motion for Judgment on the Pleadings, and it granted Plaintiff's Motion for Leave to File a Second Amended Complaint *Instanter*.

President of DMF.  At all relevant times prior to August 1, 1997, James Ungerleider, M.D. was

Acting Director of the Division of Hematology and Oncology at the Medical Center and an

employee of DMF.[4]

Between his 1990 appointment and 1996, Plaintiff alleges a number of instances of

"threats, intimidation, and harassment"at The James and the Medical Center based upon his

Israeli national origin, all of which he contends were designed to force him to leave The James,

the Medical Center, and the College of Medicine.  Plaintiff alleges that the threats, intimidation,

and harassment took the form of negative performance reviews.  He argues that Defendants did

not conduct these review in accordance with standard procedure, and that they did not offer

Plaintiff adequate opportunity to defend himself.  At Mazzaferri's request, William Bay, M.D.,

Chairman of the Medical Center's Clinical Quality Management Committee ("QA Committee"),

conducted a peer review of Plaintiff's patient care between December 11, 1996, and February 21,

1997.  Bay concluded that there was no evidence that Plaintiff had provided negligent or

substandard care, though there were some areas of concern.  Again at Mazzaferri's behest, Bay

conducted a second, more extensive review, concluding in a May 16, 1997 report, that, while

there was still no evidence of negligence, Plaintiff's patient care was "inconsistent with [that of]

a board certified hematologist and oncologist providing care at a university medical center."

In March 1997, at Mazzaferri's request, Ungerleider assembled a faculty review panel

from the Medical Center's Division of Hematology and Oncology to review Plaintiff's

performance.  According to Plaintiff, Ungerleider selected each member of the faculty review

---

[4]Although Plaintiff named Mazzaferri and Ungerleider as Defendants, in its September
29, 2003 Order, the Court dismissed all of Plaintiff's raised against Mazzaferri and Ungerleider.

panel with significant input from Mazzaferri and/or each member was significantly conflicted by his relationship with Mazzaferri. The faculty review panel concluded that Plaintiff "did not meet the standards expected of an academic hematologist and oncologist." The faculty review panel was then asked to conduct a more extensive review of Plaintiff's performance. Plaintiff alleges that, at Mazzaferri's request, Bay prepared an inaccurate summary of the panel's findings after its second review.

Based on the reviews by Bay and the faculty review panel, Mazzaferri directed the QA Committee to conduct a hearing on June 11, 1997 to review Plaintiff's patient care. Also in June 1997, Mazzaferri recommended that re-authorization of Plaintiff's clinical privileges at the Medical Center, determined on a biannual basis, be denied. Because of Mazzaferri's negative recommendation, the Medical Center's Credentials Committee conducted a review of Plaintiff's patient care. During the pendency of the reviews by the QA Committee and the Credentials Committee, Mazzaferri initiated a third review by establishing an Internal Medicine Clinical Quality Management Committee ("Internal Medicine Committee").

On August 6, 1997, the Internal Medicine Committee recommended that the Division of Hematology and Oncology supervise all of Plaintiff's clinical activities. On August 13, 1997, the QA Committee adopted the Internal Medicine Committee's recommendation. On August 22, 1997, Mazzaferri rejected the recommendation of the QA Committee. Also on August 22, 1997, Bay reported to the Credentials Committee that, based on Mazzaferri's rejection of the proposed corrective plan, the QA Committee had no alternative but to recommend that Plaintiff be denied clinical staff privileges at the Medical Center. Both the Internal Medicine Committee and the QA Committee eventually formally concluded that Plaintiff's patient care "does not meet the

Standards of Care of a board-certified Hematologist/Oncologist at a tertiary care medical center."

On August 1, 1997, Clara Bloomfield, M.D. succeeded Ungerleider as Director of the Division of Hematology and Oncology. Plaintiff claims that Bloomfield "recognized that the peer review process conducted to date with respect to Plaintiff did not comply with the customs, policies and procedures, and Bylaws of the Medical Center and/or The James." He alleges that, in an effort to "circumvent any legal problems" arising with respect to the past peer review of Plaintiff, Bloomfield "joined the conspiracy to effectuate" Plaintiff's expedited departure from The James, the Medical Center, and the College of Medicine. Plaintiff alleges that she did so by: (1) instituting formal corrective action against Plaintiff at The James; (2) coercing Plaintiff into "accepting a nominal severance" in exchange for his resignation; (3) reducing Plaintiff's income from his private practice; and (4) "freezing Plaintiff out from activities and responsibilities of the Division of Hematology and Oncology."

In September 1997, the charges against Plaintiff were transferred from the Medical Center to The James, and The James began to take formal corrective action against Plaintiff. Bloomfield assigned Mazzaferri the task of nominating the members of The James Investigative Committee, and Mazzaferri did so. Mazzaferri directed The James Investigative Committee to limit its review to the Medical Center QA Committee's evaluation of Plaintiff. On November 24, 1997, the James Investigative Committee concurred with the QA Committee's assessment that Plaintiff did not meet the standard of an academic hematologist/oncologist. The James Investigative Committee recommended that Bloomfield not assign Plaintiff any patient care at either The James or the Medical Center.

Plaintiff refused to resign or settle the charges against him.  In February 1998, Bloomfield engaged Raymond Weiss, M.D. to conduct an outside review of Plaintiff's patient care.  Plaintiff alleges that Weiss was biased against him, and that the two had various conflicts of interest.  The cases selected for Weiss's review were selected because they suggested that Plaintiff had deviated from acceptable medical standards.  Weiss's outside review concurred with The James Investigative Committee's findings.

On June 29, 1998, Bloomfield recommended to David Schuller, M.D., Director of The James, that Plaintiff's clinical privileges be suspended immediately for failing to meet the standard expected of an academic hematologist/oncologist.

On July 1, 1998, DMF declined to renew Plaintiff's employment contract, rendering Plaintiff unable to meet his requirements under the College of Medicine's Practice Plan, which requires all physicians to be employed by an approved private practice corporation.  Plaintiff thus became responsible for of establishing and maintaining his own private practice at both The James and the Medical Center.  Mazzaferri ordered non-renewal of Plaintiff's employment contract, and denied a subsequent request by Schuller that Plaintiff's employment be reinstated.  Instead, Mazzaferri demanded that Schuller reconsider Plaintiff's relationship with The James.

Plaintiff specifically identifies various instances of "significant harassment" beginning in July 1998, purportedly all for the purpose of coercing him to leave the Medical Center and The James.  First, Plaintiff alleges that Barbara Nesbitt, the administrator in 1990 for then-Director of the Division of Hematology/Oncology Dr. Balcerzak, called attention to Plaintiff's Israeli accent and stated "this is not the Middle East and we Americans are different."  Second, Plaintiff claims that on December 10, 1997 Dr. Bloomfield said that she needed to be blunt with him because he

was "not American and [he did] not understand the American way."  Further, she allegedly told

Plaintiff that she was married to a "bloody foreigner" like him; Plaintiff asserts that he was

deeply insulted by her statement.  Third, Plaintiff alleges that various doctors told him that OSU

had "tried to get rid" of him, but that because he was an Israeli, he did not get the message.

Fourth, Plaintiff alleges that other doctors ignored Plaintiff's wife at annual office parties

because he was not American.  Fifth, he alleges that he was discriminated against when OSU

nurses commented that patients from rural Ohio could not understand Plaintiff because of his

accent.  Lastly, Plaintiff asserts that animus presented itself in his discussions with Dr.

Ungerleider about having served in the Israeli Army.  Plaintiff claims that he and Dr.

Ungerleider had a number of such discussions from 1990 through 1995.

On August 12, 1998, Schuller rejected Bloomfield's recommendation to suspend

Plaintiff's clinical privileges at The James, allowing Plaintiff to maintain his clinical privileges

through the pendency of the Grievance Committee process.  Plaintiff alleges that The James

Grievance Committee did not comply with The James Bylaws and did not allow him adequate

opportunity to defend himself.  The Grievance Committee findings, reported on October 29,

1999, concluded, among other things, that Plaintiff "does not conform to the standards of a

University practitioner."  On May 5, 2000, Schuller adopted the Grievance Committee's report.

On July 1, 2001, after various other reviews and procedures, Plaintiff's clinical privileges

at the Medical Center were revoked.  His clinical privileges at The James were suspended on

March 15, 2002, and formally revoked on April 5, 2002.  The Medical Staff Administrative

Committee at The James (the "MSAC") perceived its charge as being "to evaluate whether Dr.

Benjamin was practicing 'below the level of care expected at an academic medical center

specializing in cancer therapy and research.'" The MSAC took note of the fact that "this level of expectation was above the usual assessment of 'standard of care' used in evaluation for negligence in medical-legal cases."  Nevertheless, the MSAC, applying this standard, recommended that Plaintiff's clinical privileges be revoked.

After revoking Plaintiff's clinical privileges, Defendants filed a report with the National Practitioner Data Bank (the "NPDB") regarding the revocation.  The NPDB is a federally-mandated data bank for maintaining information regarding physicians practicing at medical facilities throughout the United States.  Under federal law, Defendants are required to report Plaintiff's revocation to the NPDB.  Yet, Defendants' report added that the basis for revocation was Plaintiff's  "incompetence."  Defendants' report to the NPDB will prevent Plaintiff from practicing medicine in the United States until the report is either removed or amended.

Defendants also reported the revocation of Plaintiff's clinical privileges to the State Medical Board of Ohio (the "State Medical Board"), which subsequently initiated an investigation of Plaintiff's patient care.  On May 8, 2003, after investigating the matter, the State Medical Board rejected Ohio State's report and "determined that no further action was required by the Board" and that the complaint had been closed.  Therefore, Plaintiff's medical license remains active in the State of Ohio, and Plaintiff would be able to practice medicine if he were granted clinical privileges from any Ohio hospital.  Nevertheless, Plaintiff claims that he cannot obtain clinical privileges until the NPDB report is corrected.

Presently, Plaintiff is a tenured professor at Ohio State with no job responsibilities. Plaintiff is licensed to practice medicine in the State of Ohio, but he does not have clinical

privileges at any hospital in the state, and he claims that he cannot obtain such privileges so long as the NPDB reports him as "incompetent."

### B.  Procedural History

In July 2000, Plaintiff sued DMF and Bloomfield in state court.[5]  In that suit, Plaintiff argued that DMF, as well as Bloomfield and other members of DMF, acted improperly when DMF failed to renew Plaintiff's employment contract, and that Plaintiff's practice was severely damaged as a result of DMF's actions.  Plaintiff dismissed this action in September 2000.

On April 9, 2001, Plaintiff filed suit against OSU in the Ohio Court of Claims seeking a temporary restraining order and a preliminary injunction to require that the hearing to determine whether he would continue to have clinical privileges at The James be "based on proper notice and opportunity to participate in such notice."  The Court of Claims denied Plaintiff's request for injunctive relief and the case was dismissed.

On May 11, 2001, Plaintiff filed a lawsuit in the Ohio Court of Claims against OSU seeking to recover damages for actions taken by OSU or OSU physicians and employees during the peer review process, or in response to Plaintiff's loss of employment with his practice plan. The Court of Claims has determined that Schuller, Bloomfield, and other OSU employees are entitled to qualified immunity.  Plaintiff's amended complaint in that state court action advances

---

[5]In that action, Plaintiff's claims were for (1) breach of contract and wrongful termination; (2) conversion and/or inadequate distribution of division common resources; (3) negligent, reckless, and/or intentional interference with business relationships; (4) negligent, reckless, and/or intentional disparagement, damage to professional reputation, slander, and defamation; and (5) negligent, reckless, and/or intentional infliction of emotional distress.

factual allegations virtually identical to the allegations made in Plaintiff's Complaint before this Court.

In September 2001, Plaintiff re-filed his action against DMF in state court. Plaintiff again argued that Bloomfield, as an agent of DMF, wrongfully interfered with Plaintiff's employment contract with DMF. Plaintiff also alleged that DMF, Bloomfield, "and other agents of [DMF]" wrongfully interfered with Plaintiff's relationship with the College of Medicine and with The James. After a portion of Plaintiff's complaint was dismissed,[6] Plaintiff voluntarily dismissed the remainder of the suit in November 2002.

On July 5, 2002, Plaintiff filed his Complaint with this Court. The Complaint named members of The James Board of Trustees ("The James Board"), acting in their official capacities as the ultimate authority for granting and revoking clinical privileges at The James; members of The Ohio State University Board of Trustees (the "OSU Board") acting in their official capacities as the ultimate authority for granting and revoking clinical privileges at the Medical Center; and both Mazzaferri and Ungerleider acting in their individual capacities. In November 2002, the parties stipulated to Plaintiff's filing of a First Amended Complaint based on defense counsel's representation that the bylaws of The Ohio State University Hospitals had been amended such that the OSU Board had been replaced by the Board of Trustees of The Ohio State University Hospitals (the "Hospitals Board") as the ultimate authority for granting and denying

---

[6]Though the order is not terribly clear, the court seems to have dismissed, for failure to state a claim, Plaintiff's claims for (1) wrongful interference with his employment contract and patient care; (2) conversion and/or inadequate distribution of division common resources; (3) defamation relating to statements allegedly made prior to July 3, 1999; and (4) infliction of emotional distress. Plaintiff's remaining claims would seem to have been for disparagement, damage to professional reputation, slander, and certain defamation.

clinical privileges at the Medical Center. Plaintiff's First Amended Complaint, filed on December 4, 2002, thus added as defendants the members of the Hospitals Board, in their official capacities as such, and dropped as defendants the members of the OSU Board.

On December 4, 2002, Plaintiffs filed his First Amended Complaint, which he brought under 42 U.S.C. § 1983. On December 5, 2002, Defendants filed a Motion for Judgment on the Pleadings. On January 14, 2003, Plaintiff filed a Motion for Leave to File a Second Amended Complaint *Instanter*.

Plaintiff's Second Amended Complaint contains several changes: (1) it explicitly states on several occasions that Defendants Mazzaferri and Ungerleider took certain actions in their capacities as DMF employees; (2) it elaborates upon ways in which certain actions were related to DMF, including DMF motivations for certain actions and the selection of peer reviewers who were also employed by DMF; (3) it emphasizes that Bay's and Bloomfield's actions were taken in their capacities as state employees; (4) it refers to certain actions as having been taken "in furtherance of the conspiratorial objective of pressuring, intimidating, and coercing the Plaintiff to leave The James, the Medical Center, and the College of Medicine in an expedited fashion"; (5) it includes in multiple contexts that Defendants Mazzaferri and Ungerleider were "acting under color of state law in their capacities as private actors jointly engaged with state officials"; (6) it adjusts, in Count V, the lists of overt actions taken in furtherance of the alleged conspiracy; and (7) it clarifies the Count III Equal Protection claim.[7] Plaintiff seeks injunctive relief

---

[7]The Second Amended Complaint cites *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) and explains that Plaintiff was subject to a different standard than the standard applied to other similarly situated physicians and that no rational basis existed for this disparate treatment. The Second Amended Complaint contains the following paragraph:

requiring The James and the Medical Center to reinstate his clinical privileges; restore his rights, duties, and obligations required of a Hematologist and Oncologist at those institutions; and correct any and all adverse actions reported to the NPDB and the State Medical Board of Ohio.

On September 29, 2003, this Court issued an Opinion and Order in which it granted in part and denied in part Defendants' Motion for Judgment on the Pleadings, and it granted Plaintiff's Motion for Leave to File a Second Amended Complaint *Instanter*.  Specifically, this Court dismissed all claims against Mazzaferri and Ungerleider and dismissed Plaintiff's Section 1983 conspiracy claim, but the Court declined to dismiss Plaintiff's "class of one" Equal Protection claim.

This matter is now before the Court on Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Defendants argue that summary judgment is appropriate as to all of Plaintiff's claims because Plaintiff cannot establish that Defendants violated (1) his procedural and/or substantive due process rights, or (2) his equal protection rights under a "class of one" theory and/or a national origin discrimination theory. Plaintiff asserts that summary judgment is not warranted because the Defendants violated his due process and equal protection rights when they revoked his clinical privileges to The James and the Medical Center.

_____

D. Other similarly-situated physicians at The James and at the Medical Center, including *inter alia*, Stanley Balcerzak, M.D., Brent Behrens, M.D., and Michael Stanek, D.O., have not been subjected to a heightened peer review standard, have not been scrutinized as harshly as the Plaintiff, and have not had their clinical privileges suspended and/or revoked upon peer review . . . .

## III.  STANDARD OF REVIEW[8]

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©).  The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).  In response, the non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The Court also must interpret all reasonable inferences in the non-movant's favor.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing the evidence).  The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; however, there must be evidence from which the jury reasonably could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986);

---

[8]This case is a bench trial.  In a bench trial, a trial court must make its own findings of fact, and draw its own conclusions of law.  *See* FED. R. CIV. P. 52(a).  The standard of review for summary judgment claims in a bench trial is the same as that applied in a standard trial.

*Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

## IV.  ANALYSIS[9]

### A.  Whether Defendants Violated Plaintiff's Procedural Due Process Rights

Plaintiff claims under 42 U.S.C. § 1983 that Defendants violated his procedural due process by depriving him of his medical privileges without adequate notice or meaningful opportunity to be heard at a meaningful time.  The Due Process Clause of the Fourteenth Amendment provides that "no State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. CONST. amend. XIV.  For a procedural due process claim under the Fourteenth Amendment to succeed, a plaintiff must first establish the existence of a

---

[9]At oral argument, Defendants argued that should the Court find for Plaintiff, it would not have jurisdiction to reinstate Plaintiff.  Defendants relied on *Ambruoso v. McGeorge*, 89 F.3d 827 (4th Cir. 1996) (holding that a plaintiff's request for de novo review of hospital administration's decision to revoke his medical privileges was not a cognizable federal claim). Defendants cite no other precedent (Sixth Circuit or otherwise) in support of their position. Plaintiff countered that the Court had jurisdiction to decide whether the Defendants had used proper procedure in deciding to revoke his medical privileges.  Further, Plaintiff argued that, should the court rule in his favor, it would not have to reach the issue of reinstatement.  Plaintiff posited that a decision in his favor would automatically restore him to the rights and responsibilities of medical staff membership as of the date of revocation.  Nevertheless, because the Court grants Defendants' Motion for Summary Judgment on all counts, it need not reach the issue of whether it has jurisdiction to reinstate Plaintiff.

liberty or property interest of which the defendant deprived him.[10]  *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978).  The plaintiff must then demonstrate that the defendant deprived him of that interest without due process of law.  *Id*. at 84.  Moreover, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)) .

Due process, however, is a flexible concept that must conform to the specific facts in a given case.  *Id*. at 334 (quoting *Morrisey v. Brewer*, 408 U.S. 471, 481 (1972)).  In *Mathews*, the Supreme Court set forth three factors that the court must weigh in its procedural due process analysis:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335 (citation omitted).

The Sixth Circuit has held that in cases in which hospitals withhold a doctor's medical staff privileges for perceived substandard performance, the relevant due process inquiry is whether, in revoking a plaintiff's clinical privileges, the Defendants relied on evidence that was reasonably related to the operation of the hospital in revoking a plaintiff's clinical privileges.  *See Yashon\ v. Hunt*, 825 F. 2d 1016 (6th Cir. 1987); *see also, Black v. Barberton Citizens*

---

[10]Plaintiff and Defendants agree that, for the purposes of procedural due process, Plaintiff has a property interest in his medical privileges.  Thus, the Court need not discuss jurisprudence surrounding what constitutes a valid property interest for procedural due process claims.

*Hosp.*, 134 F.3d 1265 (6th Cir. 1998).  In the case sub judice, Plaintiff alleges that the

Defendants fired him for inadequate performance.  As such, the standard set forth in *Yashon* and

*Black*, discussed more fully below, controls this case.

In *Yashon*, the plaintiff sued the defendants pursuant to 42 U.S.C. § 1983 to compel his

reinstatement to the attending medical staff at the Ohio State University Hospitals.  *Yashon*, 825

F.2d at 1017.  The defendants moved for summary judgment as to the plaintiff's claims.  *Id*.  The

district court granted the defendants' motion for summary judgment and reentered a prior order

of the court determining that in rejecting the plaintiff's application for reappointment, the

defendants had provided the plaintiff with required due process.  *Id*.

The Sixth Circuit affirmed the district court's decision, holding that the scope of its

review of the plaintiff's claims was "fairly narrow" and generally limited "a federal court's

review of disciplinary actions taken against a physician by a hospital" to "determining whether

the procedures used violated any federal rights and whether the administrative body was

presented with substantial evidence to support its ultimate action."  *Id*. at 1022 (citations

omitted).  Further, the Sixth Circuit found that it was not a court's function to review the merits

of the charges brought against a physician, and that courts should "generally afford great

deference to 'the decision of a hospital's governing body concerning the granting of hospital

privileges.'"  *Id*. (citations omitted).  The court reasoned that in a case of this nature, the

"pertinent question" is whether the decision-maker relied on evidence reasonably related to the

operation of the hospital and the attending medical staff in denying a physician's application for

reappointment.  *Id*. at 1025.  If the decision to deny a physician's application for reappointment

is based upon such grounds, then "the decision" is "within the discretion of the MSAC."  *Id*.

Moreover, the court recognized the fact that hospitals have an important interest in retaining "only competent and highly compatible physicians on their medical staffs." *Id*. at 1022.

In *Black*, the plaintiff, who possessed medical staff privileges, challenged the defendants' decision to put him on probation for allegedly engaging in thirty-nine incidents of disruptive conduct at the defendant hospital. 134 F.3d at 1266. The plaintiff filed suit in state court and obtained a preliminary injunction against the defendants, which *inter alia* enjoined the defendants from taking any disciplinary action against him. *Id*. After the plaintiff amended his complaint to add a party and claims under both 42 U.S.C. § 1983 and the Equal Protection Clause of the United States Constitution, the defendants removed the action to federal court where they petitioned the district court to dissolve the preliminary injunction, or alternatively, to appoint a special master. *Id*. at 1267. The district court denied both of defendants' motions. *Id*.

On appeal, the Sixth Circuit remanded the action, modifying the preliminary injunction but staying it until the court acquired findings of fact. *Id*. at 1266. The court reasoned that the injunction prevented the hospital from investigating or disciplining the plaintiff regarding complaints arising *after* the injunction's issuance. *Id*. at 1268 (emphasis added). The defendants' inability to investigate or discipline the plaintiff for any new complaints during the pendency of the preliminary injunction prevented the hospital from addressing "charges of [physician's] incompetence or any form of [physician's] less than satisfactory performance." *Id*. The court determined that hospitals must be permitted to address such issues as a matter of law. *Id*.

In this case, both Plaintiff and Defendants had important interests at stake in the MSAC hearings. *Yashon*, 825 F.2d at 1022. Plaintiff had a "significant" interest in retaining his clinical

-17-

privileges in order to "maintain his professional reputation and his income." *Id*. Defendants had an important interest in "retain[ing] only competent and highly compatible physicians on its medical staff." *See id*. ("Hospitals have an important 'interest in quickly dealing with incompetence and debilitating personal frictions,' in order to ensure '[e]ffective performance by physicians on the staff . . . whose tasks require a high degree of cooperation, concentration, creativity, and the constant exercise of professional judgment.'" (quoting *Stretten v. Wadsworth Veterans Hosp*., 537 F.2d 361, 368 (9th Cir. 1976))).

In weighing both parties' interests when considering the sufficiency of the process that was provided to Plaintiff at the MSAC hearings, this Court is mindful that *Yashon* and *Black* demand that the Court limit its inquiry and that it decline from reviewing the merits of the charges against Plaintiff. *Yashon*, 825 F.2d at 1022. As such, in this case, the Court may only consider whether the procedures used by Defendants "violated any [of physician's] federal rights and whether the administrative body was presented with substantial evidence to support its ultimate action." *Id*. (citations omitted).

Defendants argue that they are entitled to judgment as a matter of law with respect to Plaintiff's due process claims because Plaintiff was afforded all process due to him under the law, and because Defendants' decision to revoke Plaintiff's clinical privileges was "rational and amply corroborated."[11] The parties do not dispute that Plaintiff has a protected property interest

---

[11]Defendants contend that *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds by Daniel v. Williams*, 474 U.S. 327 (1986), provides an alternative basis for dismissing Plaintiff's procedural due process claim. Because Defendants assert that they have "no reservation" about the Court reaching the merits of Plaintiff's procedural due process claim, the Court does not address the parties' *Parratt* arguments. For purposes of this Motion, the Court evaluates the merits of Plaintiff's procedural due process claim.

-18-

in his medical staff privileges for the purposes of his Procedural Due Process claim.[12]
Accordingly, this Court's procedural due process analysis pertains only to the issue of whether
Defendants afforded Plaintiff adequate procedural process under the law.  In analyzing this
claim, the Court considers the following factors: (1) adequacy of notice; and (2) opportunity to
be heard at a meaningful time in a meaningful manner.

### 1.  Adequacy of Notice

According to Defendants, the record before this Court contradicts Plaintiff's contention
that he did not receive "sufficient" notice of the charges against him in accordance with The
James Bylaws.  Defendants argue that they sent letter correspondence both to Plaintiff and to his
counsel which, among other things, notified Plaintiff of the charges pending against him,
informed him of Dr. Schuller's recommendation to revoke Plaintiff's clinical privileges, and
notified Plaintiff of his right to appeal to the MSAC and request a hearing.  Additionally, after
Plaintiff requested a hearing and obtained access to certain requested documentation, Defendants
contend that they gave Plaintiff advance notice of the MSAC  hearings in accordance with The
James Bylaws.

Plaintiff counters that Defendants did not give him timely and adequate notice.  While
Defendants focus on the notice with which they provided Plaintiff before the MSAC hearings (in
April and May 2001), Plaintiff claims that the truly relevant time period for notice extends back
to the first QA Committee (held on June 11, 1997).  He believes that this is the relevant time
period because in confirming other committees' prior adverse decisions, the MSAC did not

---

[12]*See supra* note 10.

conduct a *de novo* review of Plaintiff's patient care.[13]  Moreover, Plaintiff alleges that because Defendants never provided him with a written definition of the standard that was being used to assess his patient care, he was not fully apprised of the charges against him.

Defendants raise the following in their response.  First, although Plaintiff complains that the MSAC did not conduct a *de novo* review, Defendants argue that Plaintiff cites no authority for the proposition that federal due process requires the MSAC to conduct a *de novo* review and prohibits that entity from considering outsider opinions.  Second, Defendants argue that Plaintiff fails to cite any authority that federal due process requires a plaintiff to receive timely notification of an investigation that could lead to more formal adverse action.  Third, Defendants argue that Plaintiff's attack on Defendants' failure to provide him with a written standard of care for practicing at an academic medical center does not create a genuine issue of material fact for trial because there is no "requirement or expectation" that such a standard of care be written and/or recorded.[14]

The Court finds that Defendants afforded Plaintiff constitutionally sufficient notice of the charges against him.  Plaintiff cites no authority supporting his assertion that Defendants were constitutionally required to provide him with notice that they were conducting investigations that could potentially lead to formal adverse action against him.  Thus, the relevant period in which

---

[13]Plaintiff argues that without *de novo* review, he would be unable to contest the findings of any review conducted in the time period ranging from the QA Meeting through the 2001 MSAC hearings.  Plaintiff also claims that he did not receive adequate notice of the June 11, 1997 QA Meeting and that this lack of notice deprived him of adequate time to prepare his defense.

[14]Defendants also point out that the common medical malpractice standard – the one that Plaintiff argues should have been used for "credentialing decisions (and presumably licensing decisions as well)" – is not codified anywhere.

the Court considers whether Defendants provided Plaintiff with sufficient notice is around the time of the MSAC hearings.[15]  The evidence shows that Dr. Schuller informed Plaintiff by letter dated January 30, 2001 of the charges against him.  That same letter contained a summary of the findings that a number of groups reached with respect to the charges levied against Plaintiff, and informed Plaintiff of Dr. Schuller's recommendation that the MSAC revoke Plaintiff's clinical privileges.  Furthermore, in the January 30 letter, Dr. Schuller informed Plaintiff that he could appeal to the MSAC and request a hearing.

The record also reflects that on February 22, 2001, Plaintiff's counsel responded to Dr. Schuller's January 30 letter and expressly requested certain documentation related to the charges against Plaintiff.  Plaintiff's counsel also requested the identity of all witnesses scheduled to appear at the MSAC hearings, documents to be presented at the hearings, and possible dates and times for the hearings.  In response to Plaintiff's counsel's requests, Dr. Holder gave Plaintiff's counsel copies of a number of documents and informed him of how to access the remaining documents.  The Court further notes that by letter dated March 26, 2001, Dr. Schuller informed Plaintiff of the charges that would be the subject of the MSAC hearings and their relationship to Plaintiff's quality of care; the range of dates respecting Plaintiff's patient care;[16] a list of some of

---

[15]From the record, it appears that Plaintiff first learned that his patient care was under peer review on June 5, 1997, when Defendants invited Plaintiff to attend the June 11, 1997 QA Committee meeting.

[16]Specifically, Dr. Schuller's March 26, 2001 letter notified Plaintiff:

The "charges" to be considered at this hearing and subsequent hearings will be to review the quality of the care you have provided to Cancer Hospital patients – beginning with the [VM] Case, which case has been the subject of previous reviews and continuing on to the review of cases conducted by Dr. Paula Silverman.

-21-

the witnesses the MSAC intended to call at the hearings; Plaintiff's right to cross-examine witnesses; Plaintiff's ability to call witnesses on his own behalf; and the relevant dates and times of the three days of hearings.  Thus, the record supports Defendants' assertion that Plaintiff received timely and adequate notice of the charges against him.

Furthermore, although Plaintiff claims that the MSAC violated The James Bylaws by not conducting a *de novo* review of Plaintiff's patient care, the Court finds that The James Bylaws, while referencing a *de novo* hearing, also permit the presentation of "evidence of the prior recommendations of the director and the committees."  The James Bylaws Rule 3335-111-06(D)(1). Thus, Plaintiff has not substantiated his claim that the MSAC's failure to conduct a *de novo* hearing created an obligation on the part of the Defendants to provide him with constitutionally sufficient notice at the beginning of the investigatory process in 1997. Plaintiff also alleges that because Defendants never provided him with any notice or definition of

_____

[Y]our patient care from 1996 to September 2000 is the subject of this review. Several evaluations, which were referenced in detail in my January 30, 2001 letter have raised specific criticisms.  In concise terms, there have been serious questions concerning your inappropriate use of immunosuppressive therapy; delays in reaching a diagnosis of myelodysplasia; excessive diagnostic testing; inadequate evaluations of patients during chemotherapy; aggressive treatment implemented despite normal lab and test results; and a general lack of diagnostic reasoning contained in what are otherwise lengthy clinic notes.  These observations have led reviewers to doubt your underlying knowledge and clinical decision-making.  Reviewers have concluded that your over reliance on data is an indication of your lack of diagnostic expertise and a difficulty with synthesis of clinical data.

More recently, a reviewer noted inadequate staging of patients; failures to request biopsies; a lack of clear goals and endpoints of treatment; inadequate assessment of treatments; inappropriate referrals for radiation; poor use of supportive care drugs; failure to recognize potential liver and brain disease; excessive treatment orders in incurable cases; and a lack of genetic referrals.  These lists are intended to be illustrative and are not exclusive listings.

the standard of care to be applied in assessing his patient care, he was not fully aware of the charges pending against him.  The Court, however, rejects this argument.  In *Yashon*, the court stated, "the lack of established standards does not render the MSAC's decision arbitrary and therefore violative of due process."  *Yashon,* 825 F.2d at 1025.  Defendants do not dispute the fact that the definition of the standard of care of a board certified hematologist/oncologist at a university medical center does not appear in any written form.  Yet, Plaintiff fails to establish that the lack of a written definition of the relevant standard of care necessarily violated his procedural due process rights.  Indeed, at least one other court has determined that codification of a standard respecting medical staff privileges is difficult and not feasible.  *See Freilich v. Upper Chesapeake Health Inc*., 313 F.3d 205, 219 (4th Cir. 2002) ("[I]n the area of personal fitness for medical staff privileges precise standards are difficult if not impossible to articulate. The subjectives of selection simply cannot be minutely codified.").  Further, the Court finds that even in the absence of a written definition of the relevant standard of care, it is indisputable that Defendants notified Plaintiff of the basis for the charges pending against him and supporting Dr. Schuller's recommendation of revocation of Plaintiff's clinical privileges.  *See supra* note 16 and accompanying text; *see also Yashon*, 825 F.2d at 1025 ("Notice in this type of informal setting need only be specific enough to enable the individual to respond to the charges raised against him; it need not rise to the level of specificity required of a criminal indictment.") (citation omitted).

Based on the foregoing, this Court holds that Defendants afforded Plaintiff constitutionally adequate notice of the charges against him.

**2.  Opportunity to be Heard at a Meaningful Time and in a Meaningful Manner**

-23-

Next, Defendants claim that they provided Plaintiff with an opportunity to be heard at a meaningful time and in a meaningful manner.  Specifically, Defendants assert that Plaintiff: (1) received the opportunity to rebut evidence against him because he was permitted to cross-examine witnesses; (2) was allowed to make statements on his own behalf; (3) had the option of calling witnesses on his behalf; and (4) was permitted to submit written materials on his own behalf.  Furthermore, Defendants assert that because Plaintiff did not appear at the first two days of the MSAC hearings, The James Bylaws allowed them to cancel the hearings and revoke Plaintiff's privileges.  Despite Plaintiff's inexplicable and un-excused absence from the start of the hearings, Defendants showed good faith in deciding to proceed.

Plaintiff makes several arguments to support his claim that Defendants did not afford him a "meaningful opportunity to be heard."[17]  First, Plaintiff avers that the MSAC hearings were rendered meaningless because Defendants did not postpone them despite Plaintiff's recent recovery from shoulder surgery.  Second, Plaintiff claims that many of the physicians involved in the peer-review process had a pecuniary interest in the outcome and that Dr. Mazzaferri and Dr. Underleider, as "key participants" in the peer-review process, each had been the subject of Plaintiff's "criticisms and complaints" to the University's administration.  Thus, Plaintiff contends that the biased decision-makers tainted the review process.  Finally, Plaintiff alleges that Defendants violated many of the James Bylaws.

Based upon the record before this Court, Defendants provided Plaintiff with an

---

[17]Plaintiff also argues that Defendants' peer review process would not pass muster under the notice and hearing requirements of the Health Care Quality Improvement Act ("HCQIA").  Because Plaintiff concedes that HCQIA is inapplicable to the case sub judice the Court does not evaluate the parties' HCQIA arguments.

opportunity to be heard at a meaningful time and in a meaningful manner.  As a threshold matter, Defendants did not deprive Plaintiff of a meaningful opportunity to be heard by denying his request to postpone the MSAC hearings.  Defendants have proffered evidence tending to show that they based their denial of Plaintiff's request both on the difficulty of scheduling new hearings and on the fact that Plaintiff appeared to engage in "normal activities" after his shoulder surgery.[18]  On April 6, 2001, Dr. Holder informed Plaintiff's counsel that shortly after his shoulder surgery, Plaintiff "participated actively" in meetings with The James officials and saw patients at his outpatient clinic between March 12, 2001 and April 3, 2001.  Furthermore, at the May 2, 2001 MSAC hearing, Plaintiff made some preliminary comments before the MSAC regarding his absence from the first two days of the hearings.

Significantly, Plaintiff commented that he did not like the fact that the first MSAC hearing, on April 11, 2001, was scheduled for the same day as his wedding anniversary, but he did not reveal whether this was the reason he had failed to attend that hearing.  Finally, notwithstanding the fact that Plaintiff was absent from the first two days of the MSAC hearings, Defendants not only provided Plaintiff with the transcript of the proceedings, but also gave him the opportunity to submit a written response to the testimony of Drs. Schuller and Silverman, who testified on April 11 and April 12, respectively. Subsequently, Plaintiff submitted a written response to Dr. Silverman's testimony to the MSAC.  Thus, Plaintiff has not substantiated his claim that Defendants' refusal to postpone the MSAC hearings deprived him of procedural due

_____

[18]Plaintiff had surgery on his shoulder on March 9, 2001.  Plaintiff filed a temporary restraining order with the Ohio Court of Claims in order to obtain a postponement of the MSAC hearings, yet that court denied Plaintiff's request and dismissed his case. *Benjamin v. Ohio State Univ.*, No. 2001-04212 (Ohio Ct. Claims Apr. 10, 2001).

process rights.

Second, Plaintiff's claim that the MSAC physicians were biased is equally unavailing. In a similar case, in which a physician at a public hospital alleged that he had been deprived of his surgical privileges in violation of his due process rights, the Sixth Circuit Court of Appeals found that where "the record [was] bare of any indication that the medical staff was in fact biased by any matter not relevant to the proper consideration of [the doctor's] qualifications," the plaintiff's bias claim could not survive the defendants' motion for summary judgment. *Woodbury v. McKinnon*, 447 F.2d 839, 844 (6th Cir. 1971).

Plaintiff claims that many of the physicians who participated in his peer-review process had a pecuniary interest in the outcome of the review "because all of them would have to cover Plaintiff's shortfall if such shortfalls persisted, or would benefit from the revenue generated by Plaintiff's patients once his patients were transferred to DMF physicians upon revocation of Plaintiff's clinical privileges." Yet, Plaintiff does not offer evidence sufficient for this Court to conclude that the physicians' alleged pecuniary interest motivated the them to deprive Plaintiff of his procedural due process rights. *See Richards v. Emanuel County Hosp. Auth.*, 603 F. Supp. 81, 85 (S.D. Ga. 1984) (holding that although "the medical staff of any hospital has a pecuniary interest in the number of doctors on the staff[,] bad motive . . . is not to be presumed" and determining that "peer review by members of the medical staff of a fellow doctor's qualifications to continue on the medical staff does not automatically violate the requirements of due process; the court refused to "presume that the possibility of financial gain would motivate the individuals

of the staff to act in an arbitrary and capricious manner").[19]

Moreover, Plaintiff's pecuniary interest argument is undercut by his own deposition testimony. When defense counsel asked Plaintiff if he believed that members of The James MSAC committee were biased against him, Plaintiff responded in the negative with one exception, and at no time did he raise the pecuniary interest argument. Because Plaintiff fails to present the Court with any evidence of Defendants' bias on the record, his bias claim must fail. *See Woodbury*, 447 F.2d at 844.

Furthermore, Plaintiff's suggestion that Dr. Mazzaferri tainted the entire peer review process is without merit.[20] Although Plaintiff claims that Dr. Mazzaferri, as a biased decision-maker, initiated the entire peer review process and eventually rejected the QA Committee's recommendation that Plaintiff be supervised, Plaintiff fails to establish that Dr. Mazzaferri's alleged taint was not attenuated by the multiple layers of the review process. It is difficult to reconcile Dr. Mazzaferri's alleged bias with the documented facts that Plaintiff: (1) received the opportunity to rebut evidence against him because he was permitted to cross-examine witnesses at the MSAC hearings; (2) was allowed to make statements on his own behalf; (3) had the option of calling witnesses on his behalf; and (4) was permitted to submit written materials on his own behalf. Additionally, although Plaintiff claims that Dr. Mazzaferri was a "key participant" in the

---

[19]It is also noteworthy that Plaintiff raises the pecuniary interest argument for the first time in his Memorandum in Opposition to Defendants' Motion for Summary Judgment.

[20]Plaintiff alleges that he, Dr. Mazzaferri, and Dr. Ungerleider were engrossed in disputes regarding Plaintiff's research funding and expense sharing among faculty members who were employed by DMF. Defendants, however, claim that such disputes arose only in 1994 and 1995, and that by March of 1996, Dr. Mazzaferri had written a "glowing letter of recommendation" in support of Plaintiff's application to become board certified. (Defs.' Mem. Supp. Summ. J. at 18).

peer-review process, Defendants note that Dr. Mazzaferri retired from the University in July 1999, almost two years before the MSAC rendered its decision, and three years before Plaintiff's clinical privileges were revoked.  From the record, it appears that Dr. Mazzaferri was not a primary decision-maker at the time that Plaintiff claims to have been deprived of his procedural due process.  *See Macene v. MJW, Inc.*, 951 F.2d 700, 707 (6th Cir. 1991) (rejecting bias allegations against an entity that was not an ultimate or primary decision-maker at the time of the alleged due process deprivation).  Examining the evidence in its entirety, the Court cannot conclude that Dr. Mazzaferri so compromised Plaintiff's peer-review process that Defendants did not give Plaintiff an opportunity to be heard at a meaningful time and in a meaningful manner.

Plaintiff's bias claim against Dr. Ungerleider is even more tenuous.  According to Defendants, Dr. Ungerleider's sole involvement with Plaintiff's peer-review process was his participation in the September 1997 meeting of the Clinical Quality Management Policy Group.  Thereafter, Dr. Ungerleider vacated his administrative position in the Division of Hematology and Oncology in August 1997, and he left the University in 2000, months before The James MSAC hearings began.  Plaintiff offers no evidence that Dr. Ungerleider was a primary decision-maker at the time that he was allegedly deprived of his procedural due process.  The *Macene* court made clear that an individual without decision-making power cannot deprive a party of his procedural due process rights.  *Macene*, 951 F.2d at 707.  Accordingly, Plaintiff's failure to assert that Dr. Ungerleider was a primary decision-maker means that Dr. Ungerleider's bias, if any, would have had no effect on his procedural due process.

-28-

The Court finds Plaintiff's reliance on Dr. Newton and Dr.'s Hodgson's testimony to substantiate his claim of a biased peer review process untenable.  Dr. Newton and Dr. Hodgson both participated in the Grievance Committee that reviewed Plaintiff's case.  The record, however, does not reflect that either physician expressed doubts or concerns regarding the revocation of Plaintiff's clinical privileges to Dr. Schuller, committee members, the MSAC, President William Kirwan, or the OSU Board of Trustees before Defendants decided to revoke Plaintiff's clinical privileges.  Accordingly, the Court does not conclude that a biased peer-review process prevented Plaintiff from receiving a meaningful opportunity to be heard.

According to Plaintiff, Defendants violated a number of The James Bylaws.  Plaintiff alleges that: (1) the Director of The James performed no investigation prior to submitting the initiation of peer-review process to a vote of the MSAC; (2) Dr. Mazzaferri, who initiated Plaintiff's peer review, also selected the members of the Investigative Committee, rather than the Director of the Division of  Hematology and Oncology; (3) Dr. Bloomfield, rather than discussing Plaintiff's patient care and informing Plaintiff of the specific activities alleged to constitute grounds for corrective action, called Plaintiff a "bloody foreigner" and pressured Plaintiff to quit; (4) two members of the Grievance Committee did not hear all of the evidence, mandating the termination of the committee and the appointment of new Grievance Committee; (5) the Grievance Committee never made any recommendation for action to Dr. Schuller, but Dr. Schuller proceeded with revocation of Plaintiff's privileges notwithstanding the committee's refusal to recommend revocation. (6) Plaintiff was never afforded the opportunity to cross-examine witnesses who appeared before the Grievance Committee; (7) the MSAC failed to postpone its hearings for good cause shown – Plaintiff's recent shoulder surgery; and (8) the

-29-

MSAC failed to conduct a *de novo* review of the Grievance Committee's decision following the hearings.

Though Defendants counter that their disciplinary actions against Plaintiff followed all of The James Bylaws, in evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party, and, therefore, the Court must adopt Plaintiff's interpretation. *Adickes*, 398 U.S. at 157. Nevertheless, despite Plaintiff's detailed analysis of which of its bylaws The James allegedly failed to follow in disciplining him, the "[v]iolation of a state's formal procedure . . . does not in and of itself implicate constitutional due process concerns." *Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996). In other words, a state actor's failure to follow its own formal procedure does not, in and of itself, amount to a constitutional due process concern. Thus, the Court's adoption of Plaintiff's claims that Defendants violated numerous sections of The James Bylaws in carrying out the peer-review process alone does not implicate procedural due process concerns. *See id*.

Therefore, the Court concludes that Defendants did not deprive Plaintiff of an opportunity to be heard at a meaningful time and in a meaningful manner,[21] and Defendants' Motion for Summary Judgment with respect to Plaintiff's procedural due process claim is **GRANTED**.

### B. Whether the Revocation of Plaintiff's Medical Privileges Was Supported by Substantial Evidence

---

[21]Defendants also assert that Plaintiff exercised two options to appeal the MSAC's decision, first to President Kirwan, who affirmed the MSAC's decision on December 7, 2001, and second to the OSU Board of Trustees, who denied Plaintiff's appeal on April 5, 2002. According to Defendants, these appeals constitute "additional procedural safeguards."

-30-

Having determined that the peer-review procedures did not violate Plaintiff's procedural due process rights, the Court now looks to whether The James MSAC based its decision to revoke Plaintiff's medical privileges on substantial evidence.  *Yashon*, 825 F.2d at 1024.  In *Laje v. R.E. Thomason Gen. Hosp.*, 564 F.2d 1159 (5th Cir. 1977), the court  stated that, "[o]n review governed by the substantial evidence rule, the issue is not whether the agency arrived at the proper conclusion on the basis of conflicting evidence, but whether it acted arbitrarily and without regard to the facts."  *Laje*, 564 F.2d at 1162.[22]  Finally, the Court must determine whether the MSAC "based its decision 'only [on] those matters which are reasonably related to the operation of the hospital.'"  *Yashon*, 825 F.2d at 1024 (quoting *Sosa v. Bd. of Managers of the Val Verde Mem'l Hosp.*, 437 F.2d 173, 176-77 (5th Cir. 1971)); *see also Freilich*, 313 F.3d at 218 ("The governing board must [] be given great latitude in prescribing the necessary qualifications for potential applicants. . . This includes the consideration of factors beyond technical medical skills.") (citations omitted).

The Court holds that Defendants based their decision to revoke Plaintiff's clinical privileges on substantial evidence.  At the outset, MSAC Chairman Copeland established the parameters of the issues to be raised and addressed in the hearings, such that only those matters which are "reasonably related to the operation of the hospital" would be considered during the hearings.  *Laje*, 564 F.2d at 1162.  He stated, "[i]ssues raised by either the Medical Center Administration or Dr. Benjamin or his counsel which have no bearing on patient care issues will not be permitted unless the presenter can link the issue to quality of patient care."

---

[22]The Sixth Circuit carefully considered the possibility that state actors may make arbitrary decisions that would violate the laws of due process.

Second, on May 22, 2001, Chairman Copeland informed Dr. Schuller that the MSAC

concurred with Dr. Schuller's recommendation that Dr. Benjamin's clinical privileges be

revoked and provided the following basis for its decision: "[Dr. Benjamin's] practice patterns,

especially with regard to diagnostic testing, did not meet the standards of this academic medical

center." On June 5, 2001, Dr. Schuller requested that the MSAC submit an addendum setting

forth the basis of the majority decision in greater detail. Chairman Copeland provided the

following rationale, based on committee members' analyses, for revoking Dr. Benjamin's

clinical privileges:

> (1) His practice pattern tended to demonstrate an excess of
> diagnostic tests.

> (2) He tended to over focus and over react [sic] to minor or trivial
> deviations of results of diagnostic tests.

> (3) His treatment patterns were strongly influenced by anecdotal
> limited experience.

> (4) His use of cytotoxic chemotherapy in the sentinel case without
> clearly establishing a diagnosis to justify such treatment prior to
> instituting the treatment.

> (5) He tended frequently to initiate or alter therapy for
> "psychosocial" indications, possibly resulting in inappropriate
> therapy.

> (6) His minimal use of clinical trial protocols.

> (7) He was perceived to defend himself with an attitude lacking
> conciliation and with an attitude of arrogance. This caused some
> members of the committee to express the opinion that his
> "rehabilitative" potential was limited.

> (8) He appeared, at times, to use therapy schedules that were not
> considered consistent with good medical practice. His defense was
> to the effect that "he knew more about these issues than others."
> However, when asked why he wasn't recording and sharing his

"superior" knowledge in the areas challenged, his response was
inadequate.

Based upon the foregoing rationale, the Court finds that the MSAC based its decision to

revoke Plaintiff's clinical privileges solely on matters "reasonably related to the operation of the

hospital," including Plaintiff's patient care at The James.  *Yashon*, 825 F.2d at 1024 (citation

omitted); *Laje*, 564 F.2d at 1162-63 (citations omitted).  It is not the province of this Court to

substitute its evaluation of the evidence for that of the MSAC; therefore, the Court finds that

Defendants relied on substantial evidence in deciding to revoke Plaintiff's medical privileges.

### C.  Whether Defendants Violated Plaintiff's Substantive Due Process Rights

Plaintiff argues that Defendants' actions violated his substantive due process rights.

Defendants counter that Plaintiff's property interest in his medical privileges does not constitute

a liberty interest protected by substantive due process.  Alternatively, Defendants argue that

should the Court conclude that Plaintiff's interest in his medical privileges rises to the level of a

fundamental liberty interest for the purposes of a substantive due process claim, Defendants have

provided him with all substantive due process required under the law.

Courts are wary of over-expanding the ambit of substantive due process by considering

plaintiffs' claims arising for violations of property interests that do not rise to the level of

fundamental liberty interests.  The Sixth Circuit explained:

[t]he interests protected by substantive due process are of course much narrower
than those protected by procedural due process. . .Interests protected by
substantive due process, which the legislature may *not* infringe upon unless
supported by sufficiently important state interests, include those protected by
specific constitutional guarantees, such as the Equal Protection Clause, freedom
from government actions that 'shock the conscience,'. . . and certain interests that
the Supreme Court has found so rooted in the traditions and conscience of our
people as to be fundamental. . . [Thus o]ur established method of substantive-due-

> process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.  Second, we have required in substantive due process cases a careful description of the asserted fundamental liberty interest.

*Bell v. Ohio State University*, 351 F.3d 240, 250-51 (6th Cir. 2003) (citations omitted) (finding that a medical student's interest in continuing her medical school education is not a fundamental interest protected by substantive due process).  Further, multiple courts have held that a "doctor has no constitutional right to staff privileges of a hospital merely because he is licensed to practice medicine."  *Sosa*, 437 F.2d at 175 (citing *Hayman v. Galveston*, 273 U.S. 414 (1927)).

Though, at first glance, Plaintiff's medical privileges do not seem equivalent to constitutionally-protected  fundamental rights,[23] the Sixth Circuit has allowed similar claims to proceed in the past.  *See Yashon*, 825. F.2d at 1027 (hearing plaintiff's claims that the MSAC's decision to reject his application for reappointment to the medical staff violated substantive due process); *see also*, *Woodbury*, 447 F.2d at 845 (considering plaintiff's claim that the standards set by the hospital authority were applied arbitrarily).  Therefore, this Court will consider Plaintiff's substantive due process claim on its merits.

To withstand substantive due process scrutiny, "a hospital's decision must be untainted by irrelevant considerations and supported by substantial evidence to free it from arbitrariness,

---

[23]Some examples of such rights include: the right to reasonable care and safety while in government custody; the right to travel locally through public spaces and roadways; the right to marry; the right to have children; the right to direct the education and upbringing of one's children; the right to marital privacy; the right to use contraception; the right to bodily integrity; and the right to abortion.  *See Bell*, 351 F.3d at 250 n. 1 (citations omitted).

capriciousness, or unreasonableness." *Yashon*, 825 F.2d at 1027 (citing *Woodbury* v. *McKinnon*, 447 F.2d 839 (5th Cir. 1971) (because hospital's refusal to reassign physician to surgical staff was based solely on its concern for standard of medical practice and welfare of patients, physician was not denied substantive due process in a hearing conducted to determine his qualifications to handle surgery and conduct surgical procedures at the hospital)). The *Yashon* court determined that because defendants presented "substantial relevant evidence" supporting its decision to deny plaintiff's application for reappointment to the medical staff, they had not violated plaintiff's substantive due process rights. *Id*.

        In this case, the MSAC presented substantial evidence on which to base its decision to revoke Plaintiff's clinical privileges. *See supra* Part IV.A. Because Defendants' based their decision on substantial evidence, it was not "arbitrary and capricious," and, therefore, not in violation of Plaintiff's substantive due process. *See Yashon*, 825 F.2d at 1027; *see also Clark v. West Shore Hosp.*, 16 Fed.Appx. 421, 428-29 (6th Cir. July 31, 2001) (terminating a doctor's contract in accordance with standard procedure was neither a deprivation of a particular

constitutional guarantee nor conscience-shocking).[24]  As a result, Defendants' Motion for

Summary Judgment with respect to Plaintiff's substantive due process claim is **GRANTED**.

---

[24]Plaintiffs can also claim substantive due process violations as to official acts that "shock the conscience" no matter what types of procedural protections accompany them.  *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923).  The official conduct "most likely to rise to the 'conscience-shocking level' is the 'conduct intended to injure in some way unjustifiable by any government interest.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  Plaintiff argues that his treatment by Defendants shocks the conscience.  He opines that though he satisfies the expected community standard, Plaintiff's NPDB report was based upon his alleged failure to satisfy the higher standards of Ohio State.  Plaintiff claims his NPDB report has effectively barred him (at least temporarily) from practicing medicine.  As such, he asserts that Defendants' actions "shock the conscience of the Court" in violation of his substantive due process rights.  In *Clark*, the Sixth Circuit Court of Appeals held that terminating a contract in accordance with standard procedure was not "conscience-shocking."  *Clark*, 16 Fed.Appx. at 429.  The Plaintiff was afforded fair procedural due process, and the NPDB report in question was based on a sufficiently thorough inquiry.  Because the Court finds that any time-bar on Plaintiff's ability to practice medicine was not intended to injure him in an unjustifiable way, Defendants have not violated Plaintiff's substantive due process.  *See id*.

**D. Whether Defendants Violated Plaintiff's Equal Protection Rights**

**1. Plaintiff's "Class of One" Claim Under 42 U.S.C. §1983**

To bring a claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law deprived him of his rights, privileges or immunities secured buy the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527 (1987). The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees that people who are similarly situated will be treated similarly.[25] *See generally, City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Equal protection claims generally prohibit, among other things, the discriminatory administration of a law neutral on its face. *Charles v. Baesler*, 910 F.2d 1349, 1356 (6th Cir. 1990) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)). The Supreme Court, however, has recognized that "the Equal Protection Clause [can also give] rise to a cause of action for a 'class of one.'" *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To present a claim as a "class of one," a plaintiff must demonstrate that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *See id*.

Though *Olech* supports the application of a "class of one" theory to a property dispute, the circuits are split on whether or not to recognize a "class of one" Section 1983 claim in the context of employment-related disputes.[26] *See Olech*, 528 U.S. at 562. The Defendants argue that Sixth

---

[25]The Equal Protection Clause provides, in part, that "no state shall make or enforce any law which shall . . . deny to any person within its jurisdiction equal protection of the laws." U.S. Const. U.S. CONST. amend. XIV § 1.

[26]The 10th, 7th, and 2nd Circuits have upheld employment-related "class of one" claims, however, other courts harbor concerns about the problems that might arise from applying the "class of one" theory to employment-related disputes. *See Kelley v. City of Albuquerque*, 375 F.

Circuit precedent does not allow plaintiffs to bring "class of one" claims under Title 42, including

claims under 42 U.S.C. § 1983.  In *Underfer*, the Sixth Circuit Court of Appeals declined to allow

the plaintiff to bring "class of one" claims under 42 U.S.C. §§ 1983, 1985 because it would not

read *Olech* "to alter the text or legislative aims of the relevant sections of Title 42."  *Underfer v.*

*Univ. of Toledo*, 2002 WL 1263957, at *3 (6th Cir. June 5, 2002).[27]  The Defendants ask the

Court to apply *Underfer's* logic to negate Plaintiff's section 1983 "class of one" claim.

Since *Underfer*, however, the Sixth Circuit recognizes Section 1983 "class of one" claims

as long as they are sufficiently specific.  *Bower v. Vill. of Mt. Sterling*, 2002 WL 1752270 (6th

Cir. July 26, 2002);  *see also*, *Klimik v. Kent County Sheriff's Dept.*, 2004 WL 193168, *3-4 (6th

Cir. Jan. 30, 2004) (the court found that the plaintiff had a cognizable "class of one" claim under

section 1983 though it disposed of that claim on other grounds).  The Sixth Circuit Court of

Appeals distinguished *Bower* from *Underfer* by focusing on the specifically retaliatory nature of

the defendant's actions in *Bower*.  *Bower*, 2002 WL 1752270, at *5.  In *Bower*, the plaintiff had

applied to the village council to be a hired as a police officer.  *Id*.  Though standard procedure

dictated that the village council had the final say in hiring incoming police officers, the mayor

---

Supp. 2d 1183, 1216-1217 (D. N.M. 2004) (citing *Campagna v. Commonwealth of Mass. Dept.*
*of Envtl. Prot.*, 206 F. Supp. 2d 120 (D. Mass. 2002) ("if supported by adequate allegations, the
applicability of the 'class-of-one' theory to an employment-based equal protection claim [would
mean that] any public employee convinced that someone similarly situated is being treated more
favorably could sue his or her employer under the Fourteenth Amendment for a violation of
equal protection.")); *see also Cain v. Tigard-Tualatin Sch. Dist. 23J*, 262 F. Supp. 2d 1120 (D.
Or. 2003) (expressing reservation about allowing plaintiffs to use a "class of one" theory in an
employment case).

[27]Though the plaintiff in *Underfer* also asserted a "class of one" claim under section
1983, the court did not determine whether such a claim could be cognizable, disposing of it on
Eleventh Amendment grounds. *See Underfer*, 2002 WL 1263957, at *3.

interfered, asserting that "the hiring of a police officer was not a council function." *Id*. at *2. Before this incident occurred, the plaintiff's parents had loudly voiced their opposition to the mayor. *Id*. Plaintiff alleged that the mayor's actions amounted to retaliation for his parents' political opposition to the mayor. *Id*. After the mayor interfered with the plaintiff's application, the village council used standard procedure to hire two other individuals as police officers. *Id*. Plaintiff's suit, was, therefore, quite similar to that of the *Olech* plaintiffs in that he sued to remedy an allegedly singular deviation from a generally applicable objective policy in which the alleged reason for the deviation was itself unconstitutional. *See id*.

In this case, Plaintiff argues that Defendants revoked his medical privileges by employing policies and standards that differed from standard hospital procedures. As such, Plaintiff's claim closely resembles that of the plaintiff in *Bower*. *See id*. Therefore, the Court finds Plaintiff's allegations sufficiently specific to comprise a cognizable claim under Sixth Circuit standards. *See id*. at *5.

The Court will now consider whether Plaintiff has raised a legitimate "class of one" claim.

### a. Is Plaintiff "Similarly Situated" to Physicians Treated Differently by Defendants

Defendants assert that should the Court find Plaintiff's Section 1983 "class of one" claim to be cognizable, the claim still fails because Plaintiff has not presented a genuine issue of material fact showing that Defendants treated him differently from similarly situated OSU physicians.

Defendants contend that Plaintiff is not similarly situated to the other OSU physicians he references in the Complaint.[28]  When considering the question of whether two employees are "similarly situated," summary judgment is only appropriate "when no rational fact finder could conclude that two employees are similarly situated upon construing the evidence in a light most favorable to the non-moving party."  *See, e.g., Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).  In order for two or more employees to be considered similarly situated, "courts should not demand exact correlation but should instead seek *relevant similarity*." *Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000) (emphasis added).  In the disciplinary context, courts have interpreted "relevant similarity" to mean that the individuals with whom a plaintiff seeks to compare his treatment "dealt with the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Ercegovich*, 154 F.3d at 352.

In this case, as long as any or all of the referenced physicians shared relevant similarities with Plaintiff, the Court will consider them to be similarly situated to him.  *Ercegovich*, 154 F.3d at 352.  Defendants concede that Plaintiff and the referenced physicians all worked at The James, and that many of them were subject to the same disciplinary process.  A fact-finder construing the evidence in a light most favorable to Plaintiff could find that being subject to the same disciplinary process constitutes relevant similarity.  *See id*.  As such, the Court finds that

---

[28]In Plaintiff's case-in-chief, he compares himself to the following physicians: Physicians No. 123 and 112, American-born hematologists and oncologists who practiced at The James during the same period of time as the Plaintiff; Physicians No. 114, and 139 American-born physicians in the Division of Hematology and Oncology; Physician No. 144, an American-born pulmonologist and a member of the Department of Internal Medicine alongside Plaintiff who shared Plaintiff's same supervisor (Dr. Mazzaferri); and Physician No. 128, an American-born surgeon who practiced at The James, and was the subject of numerous reviews.

Plaintiff's argument that he is similarly situated to Defendants withstands summary judgment. *See id*.

Should the Court determine that Plaintiff and doctors are similarly situated, Defendants' argue that Plaintiff cannot present evidence showing that Defendants treated him differently. Among the doctors to whom he compares himself, Physicians No. 148 and 156 were each subject to peer review and eventual corrective action at University Hospital. Neither of these physicians currently practices medicine at OSU, and University Hospital reported its decision not to renew their privileges to the NPDB. University Hospital, however, did not inform the NPDB that these physicians were "incompetent." *Id*. The crux of Plaintiff's complaint is that the NPDB report of his incompetence prevents him from practicing medicine. Given that these two physicians had relevant similarities to Plaintiff but were not reported to the NPDB as being "incompetent," Plaintiff has established a genuine issue of material fact as to whether he was similarly situated to physicians who Defendant treated differently.

This Court will now examine Plaintiff's "class of one" claim on its merits.

### b. Proving "Class of One" Claims Under Section 1983

Once a plaintiff has identified similarly situated individuals being treated differently by a defendant, he may establish a Section 1983 "class of one" claim by "proving either of the following: (1) by refuting every conceivable basis which might support the government action; or (2) by demonstrating that the challenged action was motivated by animus or ill will." *Klimik*, 2004 WL 193168, at *4. The Court finds that Plaintiff cannot establish a genuine issue of material fact as to whether he has a viable section 1983 "class of one" claim under either prong of the test.

-41-

**i. Plaintiff's Rational Basis Analysis**

Plaintiff has not presented sufficient evidence to create a genuine issue of material fact as to whether Defendants had no rational basis for revoking his medical privileges. Defendants reason that they employ a higher standard of care at their facilities in order to provide their patients with the highest quality medical care possible. Courts afford great deference to the hospital decision-maker and must look primarily at whether the decision-maker "relied on evidence that is reasonably related to the operation of the hospital and the attending medical staff." *Yashon*, 825 F.2d at 1025. In considering Plaintiff's Procedural Due Process claim, the Court dismissed Plaintiff's claim that Defendants had no rational basis for their actions. *See supra*. Part IV.A. The Court found Plaintiff had been afforded all of the substantive and procedural protections required by law. *See id*. Plaintiff could not establish a question as to whether Defendants had a rational basis for their revocation of his medical privileges in the context of his procedural due process claim. Logically, Plaintiff's identical argument in the context of his Equal Protection claim must also fail.

**ii. Plaintiff's Animus Claim**

The Sixth Circuit interprets animus to mean "mere arbitrariness" or "personal animosity." *See Boone v. Spurgess*, 385 F.3d 923 (6th Cir. 2004). "Animus comes into play only when no rational reason being imaginable for injurious action taken by defendant against plaintiff, the action would be inexplicable but for animus." *Ross v. Duggan*, 402 F.3d 575, 589 (6th Cir. 2004).

Plaintiff cannot present a genuine issue of material fact that Defendants' decision to revoke his privileges was motivated by animus or ill will. Plaintiff argues that disputes regarding

Plaintiff's research money, the distribution of expenses between physicians (and Plaintiff's complaints regarding the same) generated considerable ill will before his review.  Furthermore, Plaintiff alleges six incidents of discrimination to show that "national origin play[ed] a part into the politics of not liking him," and eventually led him to lose his medical privileges.  First, Plaintiff alleges that Barbara Nesbitt, the administrator in 1990 for then-Director of the Division of Hematology/Oncology Dr. Balcerzak, called attention to Plaintiff's Israeli accent and stated "this is not the Middle East and we Americans are different."  Second, Plaintiff claims that on December 10, 1997 Dr. Bloomfield said that she needed to be blunt with him because he was "not American and [he did] not understand the American way."  Further, she allegedly told Plaintiff that she was married to a "bloody foreigner" like him; Plaintiff asserts that he was deeply insulted by her statement.  Third, Plaintiff alleges that various doctors told him that OSU had "tried to get rid" of him, but that because he was an Israeli, he did not get the message.  Fourth, Plaintiff alleges that other doctors ignored Plaintiff's wife at annual office parties because he was not American.  Fifth, he alleges that he was discriminated against when OSU nurses commented that patients from rural Ohio could not understand Plaintiff because of his accent.  Finally, Plaintiff asserts that animus presented itself in his discussions with Dr. Ungerleider about having served in the Israeli Army.  Plaintiff claims that he and Dr. Ungerleider had a number of such discussions from 1990 through 1995.

None of these six incidents rises to the level of animus laid out in *Ross v. Duggan*.  *See Ross*, 402 F.3d at 58.  Courts recognize the importance of a hospital's interest in retaining competent physicians and generally afford great deference to the "'decision of a hospital's governing body concerning the granting of hospital privileges.'"  *See Yashon*, 825 F.2d at 1016;

*see also Black*, 134 F.3d at 1265.  As such, in this case, the pertinent question before this Court is

"whether the decision-maker relied on evidence reasonably related to the operation of the hospital

and the attending medical staff."  *See Yashon*, 825 F.2d at 1016; *see also Black*, 134 F.3d at 1265.

Defendants suspended Plaintiff after he had undergone a thorough review process as well

as a two-day hearing at which he was able to contest the findings of those reviews.  Defendants

afforded Plaintiff both procedural and substantive due process, and had a rational basis for

revoking Plaintiff's medical privileges.  *See supra* Parts IV.A-C.  Because Defendants' had a

rational basis for their treatment of Plaintiff, Defendants' ill-will (if any) does not rise to the level

of animus necessary under *Ross*, which held that animus comes into play *only* when *no rational*

*reason exists* for any "injurious action taken by defendant against plaintiff." 402 F.3d at 589

(emphasis added).

Considering the above analysis, Defendants' Motion for Summary Judgment with respect

to Plaintiff's Section 1983 "class of one" Equal Protection claim is **GRANTED**.

## 2. Plaintiff's Claim of Employment Discrimination on the Basis of National Origin Under 42 U.S.C. § 1983

Plaintiff alleges that Defendants discriminated against him on the basis of his national

origin.  Equal protection claims generally prohibit, among other things, the discriminatory

administration of a law neutral on its face.  *Charles v. Baesler*, 910 F.2d 1349, 1356 (6th Cir.

1990) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886)).  *See id*. As national origin is a

suspect classification, the Court reviews Plaintiff's claim under strict scrutiny.  *Regents of Univ.*

*of California v. Bakke,* 438 U.S. 265, 267 (1978) (holding that racial and ethnic classifications of

any sort are inherently suspect and call for the most exacting judicial scrutiny).  As such, the

Court must consider whether Defendants' revocation of Plaintiff's medical privileges was narrowly tailored to meet a compelling state interest. *See Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 227 (1995).

      To establish a national origin discrimination claim under 42 U.S.C. § 1983, a plaintiff may point to direct evidence of discrimination. *See DiCarlo v. Potter,* 358 F.3d 408, 415-16 (6th Cir. 2004). Direct evidence is "evidence which, if believed, requires the conclusion that the unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 415. "It shows that the person who made the challenged decision, or was otherwise meaningfully involved in that decision, had a bias or that bias affected the challenged decision." *Nemet v. First Nat'l Bank of Ohio,* 1999 WL 1111584, *4 (6th Cir. Nov. 22, 1999). Comments potentially constitute direct evidence of discrimination provided that (1) they were made by a decision maker, and (2) the decision-maker's treatment of the plaintiff was based on a predisposition to discriminate on the basis of religion or national origin. *Carter v. Univ. of Toledo,* 349 F.3d 269, 273 (6th Cir. 2003). If the direct evidence is in the form of a comment, (or a series of comments) courts consider, among other things, whether the comment was made by a decision-maker or an agent in the scope of his employment, and whether the comment was related to the decision-making process. *See id.* This court has held that "direct evidence in the form of verbal comments [will be] similar to an employer telling its employee that 'I fired you because you are disabled.'" *Das v. Ohio State Univ.,* 115 F. Supp. 2d 885, 889 (S.D. Ohio 2000 (Marbley, J.), *aff'd,* No. 00-4429, 2003 U.S. App. LEXIS 2236 (6th Cir. Feb. 6, 2003). Nonetheless, comments made by individuals not involved in the decision-making process do not constitute direct evidence of discrimination. *Id.*

In this case, Plaintiff points to six specific incidents[29] of comments and behavior that he believes substantiate that Defendant's decision to revoke his medical privileges was not narrowly tailored to serve a compelling state interest.  *See Adarand Constructors, Inc.,* 515 U.S.  at 227.  The first, third, fourth, fifth, and sixth incidents all fail to constitute direct evidence of discrimination because they do not relate to decision-makers or the decision-making process.  *Carter*, 349 F.3d at 273.  The first incident is not direct evidence because Ms. Nesbitt was not Plaintiff's superior and because the comment occurred in 1990, before OSU had even begun to conduct a peer review Plaintiff.  The third incident also did not involve statements in the course of the decision-making process.  The Plaintiff alleges only that the third incident shows that he was intimidated because he was an Israeli who would not get the message that he should leave OSU.  The fourth and fifth incidents are not direct evidence because, in both cases, many, if not all, of the doctors and nurses who allegedly commented on Plaintiff's accent were not decision-makers and were in no way involved in the decision-making process.  Finally, the sixth incident amounts to five years of conversations between two doctors about Plaintiff's time spent in the Israeli army.  Plaintiff provides no support for his allegation that Dr. Ungerleider used their conversations about the Israeli army as evidence in deciding to revoke Plaintiff's medical privileges.

Though the second incident provides Plaintiff's strongest support for direct evidence of Defendants' animus, it too must fail.  Dr. Bloomfield was a decision-maker in the peer review process, but the process began in 1996, prior to Dr. Bloomfield's December 1997 arrival at OSU.  Thus, Dr. Bloomfield did not play a part in initiating Plaintiff's peer review, and she was not even

---

[29]S*ee supra* Part IV.D.1.b.ii.

an OSU employee when Plaintiff's peer review process began.  Further, Dr. Bloomfield disputes

that she ever made the alleged "bloody foreigner" comment, and Plaintiff offers no evidence that

the remark (if it was made) was not isolated.  When a few months pass between an allegedly

discriminatory incident and an adverse employment-related decision, the hiatus is too great for

the incident to constitute direct evidence of discrimination.  *See Das*, 115 F. Supp. 2d at 889

(finding that isolated comments made three to six months before an adverse employment action

were not close enough in time to constitute direct evidence of discrimination).  In this case,

because Dr. Bloomfield made her alleged remarks "a few months before [Dr. Bloomfield]

recommended Plaintiff's primary suspension," the two occurrences are probably *not* close enough

in time to constitute direct evidence of discrimination.

Nevertheless, in the absence of direct evidence of discrimination, a plaintiff may also

establish a discrimination claim through inferential proof of discrimination.  *See generally, Texas*

*Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248 (1981); *see also, McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973).  A court considers such indirect evidence under the *McDonnell*

*Douglas* burden-shifting approach.  *See McDonnell Douglas*, 411 U.S. 792.  *McDonnell Douglas*

gives a plaintiff the initial burden of proving by a preponderance of the evidence a prima facie

case of discrimination.  *Id*. at 802.  In order for Plaintiff to establish a prima facie case of

disparate treatment based on national origin discrimination, he must show: (1) that he belongs to a

protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for

medical privileges; and (4) that for the same or similar conduct he was treated differently than

similarly situated non-minority employees or that he was replaced by someone outside of his

protected class.  *See Hopson*, 306 F.3d at 433 (the foregoing standard is adopted from Title VII,

employment discrimination law).  If the plaintiff cannot establish all of the elements necessary to prove a prima facie case, the court should grant summary judgment for the defendant.  *See Burdine*, 450 U.S. at 253.

If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action at issue.  *Id*.  Once the defendant introduces evidence of a legitimate, nondiscriminatory reason for its actions, any presumption of discrimination raised through the establishment of a prima facie case is rebutted and "drops from the case."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  To avoid summary judgment the plaintiff must then point to evidence sufficient to permit a fact finder to conclude that the proffered reason for the employment action is pretextual, and that discrimination is the true reasoning.  *Id*.

The Court finds that Plaintiff has not established that Defendants violated Section 1983 by discriminating against him on the basis of national origin.  Though Defendants do not dispute that Israelis constitute a protected class, or that Defendants revoked his medical privileges, he cannot make out a prima facie case of discrimination on the basis of national origin because he cannot prove that he was *qualified* to retain his clinical privileges at The James.[30]

---

[30]Defendants also assert that Plaintiff cannot show that his termination was the result of being treated differently from other similarly situated U.S.-born physicians.  Because the Court finds that Plaintiff cannot prove that he was qualified for the position, Plaintiff has no prima facie case of employment discrimination.  Therefore, the Court need not consider the issue of whether or not Plaintiff was treated differently from other similarly situated U.S.-born physicians.

In *Cline v. Catholic Diocese of Toledo*, the Sixth Circuit found that when reviewing the third element of a plaintiff's prima facie case on summary judgment, a court must look at a plaintiff's qualifications *before* the unacceptable performance began. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 662-63 (6th Cir. 1999) (emphasis added).[31] Ordinarily a plaintiff's burden in meeting [the qualification] element is not exacting. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) (*en banc*) (holding that plaintiff must only satisfy the objective qualifications of a position to satisfy *McDonnell-Douglas*). However, in *Yashon* the Sixth Circuit held that it is not a court's province to review the merits of the charges against a physician, and that "courts generally afford great deference to the decision of the hospital's governing body concerning the granting of hospital privileges." *Yashon*, 825 F.2d 1022. Further, the Fifth Circuit held that though a doctor may meet the "paper qualifications" stated in a hospital's by-laws, "[w]e do not think, however, that this stated triad confers an unconditional right to hospital privileges if the Hospital Board chooses to exact additional standards reasonably related to the operation of the hospital." *Sosa*, 437 F.2d at 176. Consequently, the Court agrees with Defendants that *Cline*'s analysis is inapplicable in the case of a physician whose hospital privileges were revoked.[32]

In this case, Defendants used The James' standard procedures to determine that Plaintiff was unqualified for his position at The James. Considering that the Court found that these procedures afforded Plaintiff both procedural and substantive due process and that Defendants'

---

[31]Plaintiff argues that the Court must consider his qualifications "prior to the onset of the events that the employer cites as its reason for termination." (Plaintiff's Reply, pg. 89 (citing *Cline*, 206 F.3d at 662-63)).

[32]The Court believes that to apply *Cline* in this case would be to negate the importance of allowing a medical facility to determine what must be done to run most effectively.

-49-

relied on substantial evidence in revoking Plaintiff's medical privileges, the Court may not now overturn the hospital's classification of Plaintiff as "not qualified."

Because the Court finds that Plaintiff did not present a prima facie case of employment discrimination under Section 1983, Defendants' Motion for Summary Judgment with respect to Plaintiff's national origin claim is **GRANTED**.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED** on all counts.  This case is dismissed with prejudice.

**IT IS SO ORDERED.**


　　__s/Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: December 1, 2005**